```
USDC SNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 15, 2013
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x
LIFEGUARD LICENSING CORP.,

          Plaintiff,

  - against -                           10-CV-9075 (PAC)

GOGO SPORTS, INC.                 OPINION & ORDER

          Defendant.
------------------------------------------------------- x

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Lifeguard Licensing Corp. ("Lifeguard") brings this action against Gogo Sports Inc. ("Gogo"), asserting claims of (1) trademark infringement; (2) unfair competition and false designation of origin under the Lanham Act; (3) cancellation of Gogo's trademark registration; (4) common law unfair competition (5) deceptive business practices; (6) breach of contract; and (7) promissory estoppel. On December 7, 2012, the parties cross-moved for summary judgment on all claims. For the reasons discussed below, the Court GRANTS Gogo's motion for summary judgment on the deceptive business practices, breach of contract and promissory estoppel claims, and DENIES both parties' cross-motions as to all other causes of action.

## BACKGROUND

Lifeguard currently owns registrations of the term "Life guard" for swim trunks and "Lifeguard" for bags, clothing, accessories, and men's underwear (collectively, the "Lifeguard Marks"). (Def. 56.1 ¶ 1; Azrak Dec.[1] ¶ 6, Ex. A.) Lifeguard does not manufacture any goods itself; instead, it licenses the Lifeguard Marks to third parties that design, manufacture, advertise, and sell Lifeguard-branded goods. (Azrak Dec. ¶ 2.) The Warnaco Group, Inc. ("Warnaco")

---

[1] Gogo moved to strike the declarations of Ruben Azrak, owner and president of Lifeguard, and Benjamin Tebele, owner of Popularity, as violative of Fed. R. Civ. P. 56(c)(4). The Court has reviewed Gogo's objections and, "rather than parsing each challenged declaration to determine which portions to strike, the Court will disregard any statements that do not comport with Rule 56[]." Rus, Inc. v. Bay Indus., Inc., 322 F. Supp. 2d 302, 307 (S.D.N.Y. 2003); see also Epstein v. Kemper Ins. Cos., 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002).

was one such licensee, which sold swimming and other apparel co-branded with its own Speedo mark from July 1, 1995 until the expiration of its license in July, 2012. (Id. ¶¶ 8, 9, 15; Wilton Dep. at 35; Azrak Dec. Ex. C.) Throughout the life of its license, Warnaco sold swimwear and apparel, at least in part, to beach safety personnel known as lifeguards. (Azrak Dec. ¶ 14; Wilton Dep. 21-22; Pl. 56.1 ¶ 6.)

Since October 2008, Lifeguard has also licensed its brand to Popularity Products LLC ("Popularity"), which sells apparel branded with "Lifeguard" and a geographic designation. (Azrak Dec. ¶¶ 16-19; Ex. C.) The mark is often accompanied by a cross symbol. (Id. ¶ 19.) Under its license with Lifeguard, Popularity sells shirts, shorts, hats, underwear, bathing suits and sweat shirts in souvenir shops, drug stores, major theme parks and retail and airport locations. (Azrak Dec. ¶ 18; Tebele Dec. ¶ 3.)

In approximately July 2009, Gogo started selling items bearing the stylized words "Life Guard San Francisco" encircling a cross symbol. (Patel Dec. ¶ 3-5.) Lifeguard learned of Gogo's sale of purportedly infringing merchandise in October, 2009, and sent Gogo a cease-and-desist letter on October 29, 2009. (Azrak Dec. ¶¶ 29, 34-35, Ex. K.) On November 2, 2009, Gogo responded by stating that, "as a gesture of goodwill," it would be willing to abandon its own trademark application and otherwise comply with Lifeguard's requests "in exchange [for] an express agreement from Lifeguard Licensing that . . . Lifeguard Licensing will agree not to pursue legal action." (Azrak Dec. Ex. L.) On November 4, 2009, Lifeguard replied that it was "amenable to [the] proposition" but wanted to "memorialize the aforementioned terms in a written agreement and also obtain a detailed accounting of Gogo Sports [sic] remaining inventory of Lifeguard merchandise" explicitly reserving all rights "pending execution of satisfactory documents." (Azrak Dec. Ex. M.) On November 16, 2009, Gogo asked Lifeguard to "[p]lease undertake steps to draft the settlement agreement that [it] suggest[ed]" and followed

2

up on November 20, 2009, seeking confirmation that Lifeguard was doing so. (Id.) That same day, Lifeguard responded that it was "drafting the agreement," which would be sent shortly, and again "reserved all rights." (Id.)

Lifeguard never sent the proposed settlement agreement and Gogo continued to pursue its trademark application for "Lifeguard San Francisco," which had been pending with the United States Patent and Trademark Office (the "USPTO"), without formal opposition, throughout the entire period of Gogo's correspondence with Lifeguard. (Patel Dec. ¶¶ 6-7, 13-17.) The USPTO approved Gogo's application on June 29, 2010. (Patel Dec. Ex. 1.) Lifeguard learned of Gogo's mark in October, 2010, and filed its Complaint on December 3, 2010.

## DISCUSSION

Summary judgment may be granted where "there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial," wherein "a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. When parties cross-move for summary judgment, the Court considers each motion separately, "'in each case construing the evidence in the light most favorable to the non-moving party.'" Novella v. Westchester Cnty., 661 F.3d 128, 139 (2d Cir. 2011) (quoting Fund for Animals v. Kempthorne, 538 F.3d 124, 131 (2d Cir. 2008)).

### I.  Trademark Infringement

"A claim of trademark infringement . . . is analyzed under [a] familiar two-prong test"

that "looks first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." Virgin Enters. Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003). "The first of these questions relates closely to the second, because a trademark's distinctiveness – the key consideration in assessing its protectability – is also a factor in determining the likelihood of confusion." Playtex Prods., Inc. v. Ga.-Pac. Corp., 390 F.3d 158, 161 (2d Cir. 2004). Gogo argues that the Lifeguard Marks are not entitled to protection because their assignment to Lifeguard's predecessor in interest was invalid; because Lifeguard has exercised inadequate supervision over its licensed products; and because they are generic marks that are not subject to protection. Each of these arguments is rejected. Lifeguard's motion for summary judgment is also denied.

    *a. Assignment in Gross*

Gogo contends that the 1980 assignment of the Lifeguard Marks from Robert Ries & Co. to Lifeguard was an invalid assignment in gross, "a purported transfer of a trademark divorced from its goodwill[2] [that] is generally deemed invalid under U.S. law." Topps, Co., Inc. v. Cabdury Stani SAIC, 526 F.3d 63, 70 (2d Cir. 2008). As the Second Circuit has explained:

> A trade name or mark is merely a symbol of goodwill; it has no independent significance apart from the goodwill it symbolizes. A trademark only gives the right to prohibit the use of it so far as to protect the owner's goodwill; a trademark cannot be sold or assigned apart from the goodwill it symbolizes. There are no rights in a trademark apart from the business with which the mark has been associated; they are inseperable. Use of the mark by the assignee in connection with a different goodwill and different product would result in a fraud on the purchasing public who reasonably assume that the mark signifies the same thing, whether used by one person or another.

Marshak v. Green, 746 F.2d 927, 929 (2d Cir. 1984) (internal quotations omitted).

---

[2] "Good will is a business value that reflects the basic human propensity to continue doing business with a seller who has offered goods and services that the customer likes and has found adequate to fulfill his needs." 1 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 2:17 (4th ed.). It "includes public confidence in the quality of the product and in the warranties made on behalf of the product, and the name recognition of the product by the public that differentiates the product from others." Premier Dental Prods. Co. v. Darby Dental Supply Co., 794 F.2d 850, 853 n.3 (3d Cir. 1986) (internal quotation omitted).

4

Here, the evidence demonstrates that Lifeguard's acquisition of the marks was accompanied by a transfer of goodwill. In 1980, Robert Ries & Co., which previously owned the marks and sold Lifeguard-branded clothing, sold all of its assets and trademarks to Ruby International, Inc. ("Ruby"), a company co-owned by Ruben Azrak ("Azrak") and Lawrence Lampl[3] ("Lampl"). (Azrak Dep. 186-89.) Ruby continued to sell Lifeguard-branded clothing, some of which it had purchased from Robert Ries & Co. and some of which it manufactured itself, to retailers. (Id. at 189-90, 193-96.) Ruby transferred the marks to RL Licensing Corp., also co-owned by Azrak and Lampl, in 1989, which licensed the trademark to corporate affiliates owned by Azrak and Lampl that continued to sell Lifeguard- branded products. (Id. at 192, 200-02.) After briefly assigning the marks to VEA Associates, which was owned by Azrak's brother and sold Lifeguard-branded clothing to retailers, the marks were returned to Azrak via assignment to Lifeguard, another of his companies and plaintiff in the instant litigation. (Id. at 207-10.) Throughout this period, companies owned or co-owned by Azrak continued to license the marks and produce Lifeguard-branded apparel. (See id. at 208.) In each case, it appears on the face of the record that "the transaction [was] such that the assignee [could] 'go on in real continuity with the past,'" Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc., 841 F. Supp. 1339, 1350 (E.D.N.Y. 1994) (quoting Merry Hull & Co. v. Hi-Line Co., 243 F. Supp. 45, 51-52 (S.D.N.Y. 1965)), because the "recipient continue[d] to produce goods of the same quality and nature previously associated with the mark[s]." Defiance Button Mach. Co. v. C&C Metal Prods. Corp., 759 F.2d 1053, 1059 (2d Cir. 1985). Accordingly, Plaintiff's marks were transferred along with its good will and were not assigned in gross.

 b. *Naked Licensing*

"A licensor must exercise some degree of supervision over the licensee on pain of

---

[3] Throughout the record, this surname is alternately spelled as both "Lampl" and "Lempl." (See, e.g., id. at 192.)

abandonment of [its] mark." E.G.L. Gem Lab Ltd. v. Gem Quality Inst. Inc., 90 F. Supp. 2d 277, 300 (S.D.N.Y. 2000), aff'd, 4 Fed. Appx. 81 (2d Cir. 2001). Gogo asserts that by engaging in naked licensing, that is, licensing the use of its marks without sufficient quality control, Lifeguard should be "deemed to have involuntarily abandoned the rights to the mark." Fendi Adele S.R.I. v. Burlington Coat Factory Warehouse Corp., 689 F. Supp. 2d 585, 596 (S.D.N.Y. 2010). To succeed on its naked licensing theory, Gogo "bears the burden of proof and must present clear and convincing evidence to support this assertion." Dual Groupe, LLC v. Gans-Mex LLC, -- F. Supp. 2d --, 2013 WL 1200361, *4 (S.D.N.Y. 2013). "The critical question in determining whether a licensing program is controlled sufficiently by the licensor to protect his mark is whether the licensees' operations are policed adequately to guarantee the quality of the products sold under the mark." Gen. Motors Corp. v. Gibson Chem. & Oil Corp., 786 F.2d 105, 110 (2d Cir. 1986).

Gogo fails to present any evidence of Lifeguard's inadequate license supervision. Indeed, the record is replete with compelling evidence of Lifeguard's supervision of its marks. For example, Lifeguard's October 7, 2008, licensing agreement with Popularity contains several quality control provisions, including a requirement that Popularity provide Lifeguard with sketches, prototypes or electronic models of proposed goods prior to their production, and submit all advertisements and other proposed uses of the Lifeguard Marks to Lifeguard for its approval. (Tebele Dec. Ex. D.) Pursuant to the licensing agreement, Azrak visited Popularity's manufacturing facilities and approved sample products provided by Popularity. (Azrak Dep. at 99-101.) Azrak similarly received samples of Warnaco's proposed products early in its relationship with Lifeguard, after which there was no need for review because Azrak relied on Warnaco's reputation as "probably the best swimwear company in the world," which "kept running the same items year after year" rather than introducing new Lifeguard-branded products

6

into the market. (Id. at 80-83.) In light of Lifeguard's quality control efforts, the Court finds that it has not abandoned the Lifeguard Marks through naked licensing.

### c. Distinctiveness

"In order for a trademark to be protectable, the mark must be 'distinctive' and not 'generic.'" Christian Louboutin v. Yves Saint Laurent Am. Holding, Inc., 696 F.3d 206, 216 (2d Cir. 2012). "Courts assess inherent distinctiveness by classifying a mark in one of four categories arranged in increasing order of inherent distinctiveness: (a) generic, (b) descriptive, (c) suggestive, or (d) fanciful or arbitrary." Brennan's, Inc. v. Brennan's Rest., LLC, 360 F.3d 125, 131 (2d Cir. 2004). "The term 'fanciful,' as a classifying concept, is usually applied to words invented solely for their use as trademarks." Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 11 n.12 (2d Cir. 1976). "When the same legal consequences attach to a common word, i.e., when it is applied in an unfamiliar way, the use is called 'arbitrary.'" Id. "A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods." Id. at 11. These categories "are deemed inherently distinctive" because "their intrinsic nature serves to identify a particular source of a product." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). In contrast, a descriptive term, one which "'conveys an immediate idea of the ingredients, qualities, . . . characteristics[,]' . . . . purpose or utility of the product," is only protected by trademark "if the holder of the mark can prove secondary meaning due to public association of the trademark with the holder's product or service." Bernard v. Commerce Drug Co., 964 F.2d 1338, 1340 (2d Cir. 1992) (quoting Abercrombie & Fitch, 537 F.2d at 11). Lastly, "[g]eneric marks are those consisting of words identifying the relevant category of goods or services," which "are not at all distinctive and thus are not protectable under any circumstances." Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 385 (2d Cir. 2004). It is well-established "that such 'pigeonholing or labeling[] has always

7

been a slippery business,' largely 'depending upon the particular context of the mark's use, . . . its time of use, . . . and its group of users.'" Bernard, 964 F.2d at 1341 (quoting 20th Century Wear, Inc. v. Sanmark-Stardust, Inc., 747 F.3d 81, 87 (2d Cir. 1984)).

Gogo's argument that the Lifeguard Marks are generic presents a factual question that is dependent on "how the purchasing public views the mark," Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 344 (2d Cir. 1999). This precludes summary judgment. "'[A] mark is not generic merely because it has some significance to the public as an indication of the nature or class of an article. In order to become generic the principal significance of the word must be its indication of the nature or class of an article, rather than an indication of its origin.'" FragranceNet.com, Inc. v. Les Parfums, Inc., 672 F. Supp. 2d 328, 333 (E.D.N.Y. 2009) (quoting King-Seeley Thermos Co. v. Aladdin Indus., Inc., 321 F.2d 577, 580 (2d Cir. 1963)).

"A mark's common usage and understanding by the relevant public may be discerned from 'any competent source,'" including, *inter alia*, "consumer surveys." Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc., 478 F. Supp. 2d 340, 360 (E.D.N.Y. Mar. 19, 2007) (quoting In re Merrill Lynch, 828 F.2d 1567, 1570 (Fed. Cir. 1987)). Gogo relies on its expert, Dr. Thomas Maronick ("Dr. Maronick"), who administered an online survey (Maronick Dec. Ex. 3) and concluded that "'Lifeguard' is a generic mark, not one of a particular company." (Maronick Dec. ¶ 11.) In an open-ended question, survey participants were asked what the term "Lifeguard" on a garment suggested to them. 79% responded that it indicated that the wearer is a lifeguard or protects/saves people by a pool or beach, and an additional 11% reported that the term suggested "safety" or "help," while only 2.7% responded that the term suggested an item that a non-lifeguard could buy and wear. (Maronick Dec. Ex. 3 at 6.) When presented with an image of Lifeguard-branded sweatshirts and up to seven answers to select from, with multiple

8

responses allowed, the vast majority of respondents understood "Lifeguard" to refer to the profession or duties of the wearer, while 19% stated that it referred to a brand, only slightly more than the 15% who answered that it did not "describe anything, just a piece of clothing." (Id. at 7-9.) Of the 19% who believed that it referred to a specific brand, only 38%, or 7% of all respondents, identified "Lifeguard" as being the brand name. (Id. at 9.)

Lifeguard attacks the validity of Dr. Maronick's study with three arguments. First, Lifeguard contends that Dr. Maronick is not qualified to provide an expert opinion because he has not previously administered a study or submitted an expert report on genericness. As Professor of Marketing at Towson University College of Business and Economics since 1987, Dr. Maronick has published academic works on consumer perception, administered surveys related to trademarks, and provided his expertise in dozens of lawsuits, including trademark matters. (Maronick Dec. Exs. 1 & 2; Maronick Dep. at 25-26, 30.) In light of the liberal construction of expert qualification requirements applied by courts within the Second Circuit and the general preference against exclusion of expert testimony, the Court finds Dr. Maronick qualified to provide expert testimony pursuant to Fed. R. Evid. 702. IBM v. BGC Partners, Inc., No. 10 Civ. 128, 2013 WL 1775437, *15 (S.D.N.Y. Apr. 25, 2013).

Second, Lifeguard argues that Dr. Maronick's survey is inadmissible under Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). "Surveys are . . . routinely admitted in trademark . . . cases to show . . . genericness." Schering Corp. v. Pfizer, Inc., 189 F.3d 218, 225 (2d Cir. 1999). In relying on criteria set forth in Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc., 559 F. Supp 1189, 1204-05 (E.D.N.Y. 1983) to claim that Dr. Maronick's survey is not sufficiently trustworthy to be admissible, Lifeguard overlooks that "[t]he Toys R Us criteria are typically used by courts to analyze the weight to be accorded to a survey, not its admissibility." Friesland Brands, B.V. v. Vietnam Nat'l Milk Co., 221 F. Supp. 2d 457, 460 n.1

(S.D.N.Y. 2002). Having reviewed Dr. Maronick's survey and Lifeguard's objections,[4] the Court finds that the survey is not inadmissible, although several of Lifeguard's objections might cast doubt on the weight that a fact-finder would afford the survey.

Third, Lifeguard asserts that Dr. Maronick recanted his conclusion that the Lifeguard Marks are generic. When deposed, Dr. Maronick said that "in [his] opinion, 'lifeguard' is not a generic [term] for 'sweatshirts'" (Maronick Dep. at 82), which Lifeguard interprets as a concession that the Lifeguard Marks "*are not generic.*" (Pl. Opp'n at 13 (emphasis in original).) The parties have only submitted excerpts of the depositions taken in this matter, which prevents the Court from determining what was meant by this statement in the absence of its context. This statement could be read to have multiple meanings. See Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 147 (2d Cir. 1997) ("It is well-established that a word may be generic of some things and not of others. . . . Accordingly, a word has been found to be generic in one application but not in another" (internal quotations omitted)); see also 2 McCarthy § 12.1. Given the testimony's ambiguity and the fact that it is limited to sweatshirts in particular, rather than discussing the broad array of apparel on which the Lifeguard Marks appear, Dr. Maronick's statement is not dispositive of whether the Lifeguard Marks are generic.

Finally, Lifeguard contends that the Lifeguard Marks are entitled to protection under the Lanham Act because they are arbitrary, as "the use of [the Lifeguard Marks] on apparel does not describe the qualities of the clothing items sold under the LIFEGUARD® brand." (Pl. Reply at 6.) That is not the test for whether a mark is arbitrary. See Horizon Mills Corp. v. QVC, Inc., 161 F. Supp. 2d 208, 212 n.4 (S.D.N.Y. 2001) ("An arbitrary term is a common term applied in an unfamiliar way"). A term that does not literally describe the good or service to which it is

---

[4] Specifically, Lifeguard objects that (1) the universe of survey respondents was not comprised of potential consumers of the parties' products; (2) the survey respondents were primed by the context and phrasing of questions; (3) the survey questions were leading; (4) the survey did not utilize a control group; (5) respondents had opportunity to discuss the survey with friends or do independent research prior to submitting their responses; and (6) information such as respondents' verbatim answers and information as to their coding was omitted.

applied, but is suggestive of it by association, is not arbitrary. 2 McCarthy § 11:11; see, e.g. Abercrombie & Fitch, 537 F.2d at 14. The Lifeguard Marks might also be found to be descriptive, if the fact-finder concludes that they "convey[] 'an immediate idea of some characteristic or attribute of the product,'" such as "'the class of intended purchasers," which could reasonably be found to consist of actual lifeguards. Bernard, 964 F.2d at 1341 (quoting PaperCutter, Inc. v. Fay's Drug Co., Inc., 900 F.2d 558, 562-63 (2d Cir. 1990)).

Based on Dr. Maronick's survey and the widespread sale of Lifeguard-branded apparel for use by lifeguards, reasonable minds can differ with respect to whether "'the primary significance of the [Lifeguard Marks] in the minds of the consuming public is not the product but the producer.'" Genesee Brewing, 124 F.3d at 144 (quoting Kellog Co. v. Nat'l Biscuit Co., 305 U.S. 111, 118 (1938)). Accordingly, the cross-motions are denied with respect to whether the Lifeguard Marks are entitled to protection because material questions of fact remain as to their distinctiveness.[5]

## II. Lanham Act Unfair Competition & False Designation of Origin

Section 43(a) of the Lanham Act "protects qualifying unregistered trademarks" but "the general principles qualifying a mark for registration under . . . the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." Two Pesos, 505 U.S. at 768. "[T]o establish protectability under § 43(a), 'a mark must be sufficiently distinctive to distinguish the registrant's goods from those of others,'" which may be demonstrated "by showing that the mark is 'inherently distinctive,' i.e., intrinsically capable of identifying its source, or by demonstrating that the mark has acquired 'secondary meaning.'" Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 116 (2d Cir. 2006) (quoting

---

[5] Since there is a material question of fact relating to whether the Lifeguard Marks are generic, it is not necessary to address whether they are incontestable under the Lanham Act. See 15 U.S.C. § 1065(4) ("no incontestable right shall be acquired in a mark which is the generic name for the goods or services or a portion thereof, for which it is registered."). Nor is it necessary to address the likelihood of confusion at this juncture, as it remains unclear whether the Lifeguard Marks are entitled to any protection whatsoever.

Star Indus., 412 F.2d at 381). Both parties' cross-motions for summary judgment are denied because there are material questions of fact remaining as to the distinctiveness of Lifeguard's trademarks. See supra.

### III. Registration Cancellation

Lifeguard seeks cancellation of Gogo's trademark registration on the grounds that Gogo's mark is likely to cause confusion and was obtained in breach of the parties' purported settlement agreement. Both parties' cross-motions for summary judgment on the registration cancellation are denied. First, since the Court finds that the parties did not form a contract, see *infra*, breach of the purported settlement agreement is not a valid basis for cancelling Gogo's registration. Second, although trademark "registrations less than five years old may be cancelled 'for any reason which would have been sufficient to deny registration in the first instance,'" Patsy's Italian Rest., Inc. v. Banas, 508 F. Supp. 2d 194, 213-14 (E.D.N.Y. 2007) (quoting Mech. Plastics Corp. v. Titan Techs., Inc., 823 F. Supp. 1137, 1150 (S.D.N.Y. 1993)), which includes where the mark sought to be registered "so resembles a mark registered in the [USPTO], or a mark . . . previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive," 15 U.S.C. § 1052(d), material questions of fact remain as to the viability of the Lifeguard Marks. If the Lifeguard Marks are generic and, therefore, not entitled to protection under the Lanham Act, likelihood of confusion between the Lifeguard Marks and Gogo's mark could not have served as a basis for denial of Gogo's mark, nor could it now serve as a basis for cancellation.

### IV. Common Law Unfair Competition

"An unfair competition claim involving misappropriation usually concerns the taking and use of a plaintiff's property to compete against the plaintiff's own use of the same property.

12

Essentially, a claim of unfair competition is the bad faith misappropriation of a commercial advantage belonging to another by infringement or dilution of a trademark or trade name or by exploitation of proprietary information or trade secrets." W. Supreme Buddha Ass'n Inc. v. Oasis World Peace & Health Found., No. 08 Civ. 1374, 2011 WL 2728456, *3 (N.D.N.Y. July 12, 2011) (quotations omitted). The same questions of material fact that preclude resolution of the Lanham Act claims also preclude disposition of the common law unfair competition claim, and, accordingly, both parties' cross-motions for summary judgment are denied.

V. **Deceptive Business Practices**

N.Y. Gen. Bus. Law § 349(a) bars "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. "While competing businesses have standing to sue under this provision, it is, 'at its core, a consumer protection device,' and thus 'the gravamen of the complaint must be consumer injury or harm to the public interest,' not mere competitive disadvantage." Mobileye, Inc. v. Picitup Corp., -- F. Supp. 2d --, 2013 WL 830837, *19 (S.D.N.Y. 2013) (quoting Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995)). Accordingly, "'it is well-established that trademark infringement actions alleging only general consumer confusion do not threaten . . . direct harm to consumers for purposes of stating a claim under section 349.'" Luv N' Care, Ltd. v. Walgreen, Co., 695 F. Supp. 2d 125, 136 (S.D.N.Y. 2010) (quoting Perkins Sch. For the Blind v. Maxi-Aids, Inc., 274 F. Supp. 2d 319, 327 (E.D.N.Y. 2003)). Rather, "for the statute to apply, a plaintiff must establish a direct harm to consumers that is greater than the general consumer confusion commonly found in trademark actions, . . . such as potential danger to the public health or safety." Eliya, Inc. v. Kohl's Dept. Stores, 82 U.S.P.Q.2d 1088, 1096 (S.D.N.Y. 2006) (internal quotations omitted).

Lifeguard's alleged injury consists solely of "confusion, mistake and deception among

the general purchasing public as to the origins of Gogo's Infringing Merchandise." (Am. Compl. ¶ 79.) That is insufficient to support a claim under § 349 because it does not rise above the "harm . . . which is generally associated with violations of intellectual property law." Id. at 1096. Gogo's motion for summary judgment is therefore granted with respect to the deceptive business practices claim.

## VI. Breach of Contract Claims

Lifeguard alleges that "[t]he October 29 and November 2, 2009 letters . . . formed a valid and enforceable contract," containing "[a]ll the material terms of the contract . . . , namely, Lifeguard's agreement to forego legal action against Gogo in exchange for Gogo's agreement to cease and desist from using its alleged mark and to abandon its application for the same," and that Gogo subsequently breached that contract.[6] (Am. Compl. ¶ 88.) "Settlement agreements are contracts and must therefore be construed according to general principles of contract law." Red Ball Interior Demolition Corp. v. Palmadessa, 173 F.3d 481, 484 (2d Cir. 1999). The "existence of a contract requires 'an offer, acceptance, consideration, mutual assent and intent to be bound.'" Prince of Peace Enters. v. Top Quality Food Mkt., LLC, 760 F. Supp. 2d 384, 397 (S.D.N.Y. 2011) (quoting Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc., 447 F. Supp. 2d 329, 337 (S.D.N.Y. 2006)).

Lifeguard's letter of October 29, 2009 "demand[ed]" that Gogo

> immediately: (1) cease distributing, advertising, promoting, licensing and/or selling products bearing the Lifeguard Trademarks; (2) collect and turn over to [Lifeguard] the remaining inventory of the Infringing Merchandise; (3) provide [Lifeguard] with a full accounting of all sales of such items, as well as the documentation supporting such accounting, including Gogo's invoices; and (4) provide [Lifeguard] with a list of all manufacturers, suppliers and distributors of the Infringing Merchandise.

(Azrak Dec. Ex. K.) Gogo's November 2, 2009 email did not constitute an acceptance, however,

---

[6] In its motion papers, Lifeguard asserts "as of Lifeguard Licensing's November 4, 2009 email, the parties had a settlement agreement, incorporating the terms set forth in the [October 29] cease and desist letter with the added term, volunteered by Gogo [on November 2]." (Pl. Opp'n at 6.) It has not amended its pleadings, however, to reflect this new argument.

14

because "an acceptance must comply with the terms of the offer and be clear, unambiguous and unequivocal. A proposal to accept the offer if modified or an acceptance subject to other terms and conditions is equivalent to an absolute rejection of the offer." Krumme v. WestPoint Stevens, Inc., 143 F.3d 71, 83 (2d Cir. 1998) (quotations omitted). Gogo did not explicitly state that it *would* comply the terms proposed by Lifeguard, only that it was "*willing*" to do so "in exchange [for an] express agreement from Lifeguard . . . not to pursue legal action," in addition to offering to voluntarily withdraw Gogo's pending USPTO application. (Azrak Dec. Ex. L (emphasis added)). Since it included new terms, Gogo's response was a rejection and counter-offer, rather than an acceptance of Lifeguard's initial offer.[7]

Moreover, even assuming *arguendo* that the exchange of letters, was an offer and acceptance, "[p]arties who do not intend to be bound until the agreement is reduced to a signed writing are not bound until that time." Powell v. Omnicom, 497 F.3d 124, 129 (2d Cir. 2007). Here, "there has been an express reservation of the right not to be bound in the absence of a writing." Kaczarcysk v. Dutton, 414 Fed. Appx. 354, 355 (2d Cir. 2011); see also Brown v. Cara, 420 F.3d 148, 154 (2d Cir. 2005).

Lifeguard, which now sues for breach of contract, was itself the party in charge of drafting the settlement agreement and failed to do so. (See Azrak Dec. Ex. M.) Moreover, as noted *supra*, it expressly stated its desire "to memorialize the . . . terms in a written agreement" and reserved its rights "pending execution of satisfactory documents." (Id.) Its purported partial performance consisted solely of refraining from filing suit, while Gogo temporarily abstained from continuing to sell allegedly infringing products. In both cases, this inaction is consistent

---

[7] Though not necessary to dispose of the contract claim, Lifeguard's November 4, 2009, response to Gogo did not constitute an acceptance of Gogo's counter-offer. First, Lifeguard's letter requested for the first time "a detailed accounting of Gogo Sports [sic] remaining inventory of LIFEGUARD merchandise" (Azrak Dec. Ex. M), whereas it had previously requested only "a full accounting of all sales of such items." (Azrak Dec. Ex. K.) Second, it implicitly disclaimed that an agreement had been reached, stating that it wanted to "memorialize the aforementioned terms in a written agreement" and that it reserved "[a]ll rights pending execution of satisfactory documents." (Azrak Dec. Ex. M.)

15

with a brief "time-out" while the settlement agreement was to be finalized. Gogo took no affirmative steps, such as withdrawing its USPTO application or turning over either merchandise or accounting information to Lifeguard, while Lifeguard had no affirmative actions to take under the proposed terms. Nor had the parties agreed on and finalized all terms, as confirmed by a November 16, 2009, email from Gogo to Lifeguard, requesting that Lifeguard specify its "preference" with respect to whether Gogo's remaining inventory "be shipped to [Lifeguard's] office or . . . . simply destroy[ed]?" (Id.) Lifeguard replied that it was in the midst of drafting the agreement, but did not answer Gogo's question. On the undisputed facts, the parties never beyond preliminary discussions. There was no contract. Gogo's motion for summary judgment is therefore granted with respect to the breach of contract claim.

## VII. Promissory Estoppel

"'In New York, promissory estoppel has three elements: (1) a clear and unambiguous promise; (2) a reasonable and foreseeable reliance by the party to whom the promise is made; and (3) an injury sustained by the party asserting the estoppel by reason of the reliance.'" Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39, 44 (2d Cir. 1995) (quoting Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir. 1989)). Lifeguard's promissory estoppel claim fails for the same reasons as its breach of contract claim,[8] discussed *supra*: Gogo offered only tentative terms, not an unambiguous promise on which Lifeguard could reasonably rely. In any event, Lifeguard's response to Gogo inserted new demands. See supra at 16 n.7. Accordingly, Gogo's motion for summary judgment is granted with respect to promissory estoppel.

## CONCLUSION

For the forgoing reasons, the Court GRANTS Gogo's motion for summary judgment

---

[8] Despite raising promissory estoppel as a separate claim, Lifeguard does not make any arguments relating to this claim as distinct from its breach of contract claim.

16

with respect to the deceptive business practices, breach of contract, and promissory estoppel causes of action, and DENIES both parties' cross-motions for summary judgment with respect to the trademark infringement, unfair competition and false designation of origin under the Lanham Act; (3) cancellation of Gogo's trademark registration and common law unfair competition causes of action. The Clerk of the Court is directed to terminate the motions at docket numbers 39 and 46.

Dated: New York, New York
August 15, 2013

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge